PER CURIAM.[1]
h The state charged defendant and Raul Jorge Castro by bill of information with armed robbery in violation of La. R.S. 14:64. The cases severed when Castro entered a plea of guilty as charged on the day before trial. Following trial by jury, defendant was found guilty as charged and sentenced to 12 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant appealed her conviction and sentence to the Second Circuit, which found that the evidence presented at trial appeared sufficient to support her conviction as a principal to the crime of simple robbery but not to the charged offense of armed robbery because the state had failed to establish that defendant knew or intended that Castro would arm himself with a gun immediately before confronting the victim in a Wal-Mart parking lot and snatching her purse from a shopping cart within her control. The court of appeal accordingly vacated defendant’s conviction for armed robbery, entered a judgment of guilt for simple robbery in violation of La. R.S. 14:65, and remanded for resentencing. State v. Smith, 42,302 (La.App.2d Cir.8/15/07), 962 So.2d 1190 (Brown, C.J., dissenting from denial of rehearing). We granted the state’s application to review the | gdecision below and reverse because we disagree with the premise of the Second Circuit’s opinion that “[t]o be a principal to armed robbery, the State must prove beyond a reasonable doubt that a defendant knew that her co-offender would arm himself with a dangerous weapon.” Smith, 42,302 at 4, 962 So.2d at 1193.
On a late August afternoon in 2005, Tammy Rogers rolled her shopping cart through a pelting rain storm to the rear of her SUV parked on the lot of a Wal-Mart on Mansfield Road in Shreveport. Rogers held an umbrella against the rain and she had placed her purse on top of the items stacked in the shopping cart. She popped the rear hatch of her vehicle to begin loading her purchases into the back when she noticed a small white car stop nearby. Rogers at first thought the occupants were looking for a shopping cart. Instead, an Hispanic man jumped out of the vehicle, ran around, grabbed Rogers’s purse out of *293 her cart, then jumped back into the car, which sped away. Rogers could not tell whether the man had anything in his hand because he was holding his arm down at his side and the confrontation had happened “very fast.” However, she observed that the vehicle had at least two other occupants.
The Hispanic male was Raul Jorge Castro and, as he admitted when he entered a guilty plea to armed robbery, he had been armed with a small, black powder hand gun. Castro was defendant’s boyfriend and they had arrived in Shreveport only days earlier from Arkansas in a stolen white Kia sedan. They were staying with defendant’s aunt in Shreveport and on the afternoon of August 9, 2005, they drove to the Wal-Mart in the company of Cody Duos, defendant’s 17-year-old cousin, and his younger brother, Dillon. Both boys sat in the back seat of the vehicle as defendant drove and Castro occupied the front passenger seat. Cody Duos testified at trial that along the way, Castro talked about removing the license plate from the car, although they were ostensibly going to the Wal-Mart only to buy some groceries. When they arrived at the Wal-Mart, defendant began driving up and down the parking lot aisles for “like just a little while,” bypassing open parking places as she and Castro discussed looking for people |swith umbrellas. Defendant then stopped briefly and Castro climbed into the back seat of the car. Cody did not notice that Castro had anything in his hand when he joined him in the back seat as defendant continued cruising the parking lot but he heard defendant and Castro discuss that Rogers would be an “easy snatch” when they spotted her. After defendant stopped, Cody noticed for the first time that Castro had a gun in his hand as he stepped out of the car and rushed towards the victim. According to Cody, defendant also got out of the car and went “[straight for the lady’s purse.” He testified that defendant then snatched the purse from the cart as Castro stood next to her with a gun and pointed it at the victim “like a little above her head just a bit.” After defendant and Castro jumped back into their car with Rogers’s purse, defendant “just started driving.... She got lost, and they ditched the purse,” but not before Castro removed Rogers’s check book and several credit cards. Defendant eventually drove to a Kentucky Fried Chicken where they used one of Rogers’s checks to pay for food at the take-out window. Cody testified that as they headed back to the residence of defendant’s aunt, defendant threatened to tie him up and beat him if he mentioned the purse snatching to anyone and Castro drove home the point by waving the gun in his face as he warned that he would kill him and his brother if he talked.
On August 11, 2005, officers from the Caddo Parish Sheriffs Office acted on tips that a redheaded woman and an Hispanic male were passing bad checks and could be found at the address of defendant’s aunt, and located the white Kia parked outside the residence. The officers ran the plate number on the vehicle and determined that it had been reported stolen in Arkansas. They knocked on the door and spoke with defendant’s aunt, who told them that the car belonged to defendant and Castro and that they were staying with her. After speaking with Cody and determining that defendant and Castro had passed a bad check at Kentucky Fried Chicken, the officers ran a check and found out that Tammy Rogers had made a report of a robbery two days earlier. They searched the white Kia and recovered the check book and credit cards taken from Rogers, along with |4two black powder pistols. Cody then led the officers to the location where Castro had discarded *294 Rogers’s purse and the police recovered that item as well. At trial, Cody Duos identified one of the guns as the weapon he had seen in Castro’s hand as he got out of the car and approached Tammy Rogers.
Following her arrest, defendant gave a statement to the police in which she initially denied any knowledge of the Rogers offense, but eventually admitted that she had been present and that, “We took a lady’s purse.” However, she denied any knowledge that Castro had used a gun. At trial, defendant testified that after they arrived at Wal-Mart, she gave the wheel to Cody and climbed into the back seat with Castro after Dillon got up front to sit next to his brother. “We stopped the vehicle,” defendant told jurors, “Jorge got out with the gun in his hand, stole the purse out of the lady’s buggy, jumped back in the car, and we took off.” Defendant identified the silver black powder pistol recovered from the Kia as the weapon Castro had held in his hand as he approached Rogers. According to defendant, Cody was still at the wheel when they drove away and defendant claimed that Cody and Dillon then got “out of the car down in the ditch and threw the purse in the woods.” Defendant denied that she wrote out one of Rogers’s stolen checks, claiming that Castro had done so, but admitted that she then passed the check at the take-out window in return for their order. Defendant again claimed that she had not planned to rob anyone, that she “never intended on any of that to happen,” and that she never armed herself with a weapon or used one in any fashion on that day. She also denied threatening Cody after the offense. Defendant explained to jurors that she had initially lied in her statement to the police because she was coming off “ice,” or crystal methamphetamine, which had produced a “speedy mind loss.”
In his guilty plea colloquy on the day before defendant’s trial, Castro acknowledged his role in the Rogers offense and confirmed that defendant had been involved as well. The state introduced a transcript of that colloquy at defendant’s trial, but when it called Castro to testify, he sought to distance himself Isfrom any statements made during his plea implicating defendant, explaining that he had been nervous and “just wanted to get it over with,” and that what he had meant to say was that defendant may have been present at the time but was not involved in any fashion with his snatching of Rogers’s purse. Castro had signed an affidavit to that effect which the defense introduced at trial in counterpoise to the state’s introduction of its witness’s plea colloquy. Castro also testified that he had “no use of force, intimidation, or nothing” toward the victim, and testified that he had been armed not with one of the black powder handguns in the car but with a silver crowbar that he discarded after the offense. Castro testified that he had entered his guilty plea to armed robbery only because, “I wasn’t getting any counsel to the best of my ability.” However, Castro eventually admitted that while he alone had approached Rogers, defendant knew that he intended to rob someone at Wal-Mart. When asked by the prosecutor whether defendant “knew that you were armed with that gun and you took that purse,” Castro replied, “Yes, sir.”
In his closing argument to jurors, the prosecutor made no effort to reconcile the divergent accounts of the confrontation in the Wal-Mart parking lot given by Cody Duos and Tammy Rogers. “What’s really germane here,” he argued to jurors, “is whether [defendant is] involved.... No matter how you think the robbery went down, it’s not really a question that it was a robbery ... that it was armed. It’s not really a question that she was involved ... *295 [as] a principal to that offense ... [and] just as guilty as everybody else.”
In reviewing the evidence presented at trial, the court of appeal also made no effort to resolve the discrepancies in the accounts of the actual confrontation in the parking lot. However, it concluded that the jurors “chose to believe the testimony of Defendant’s young cousin, Cody, as opposed to Defendant and Castro,” at least •with respect to the circumstances leading up to the confrontation and the events which then took place following the offense. Smith, 42,302 at 12, 962 So.2d at 1197. Thus, evidence “that Defendant was the driver of the getaway vehicle and that Defendant was involved in the planning, commission and, later, | nan attempted coverup of the offense,” established, “[b]y all aspects of the definition of principal to the offense,” that defendant “could be found guilty as a principal based on any of her actions before, during and after the offense.” Id., 42,302 at 11, 962 So.2d at 1196.
However, in determining exactly what offense defendant had committed, the court of appeal found that “[t]he evidence is insufficient ... to establish that Defendant had any knowledge or intent that Castro would arm himself with a dangerous weapon.” Id., 42,302 at 12, 962 So.2d at 1197. Defendant denied any such knowledge and no other witness at trial “provide[d] any evidence that Defendant knew or anticipated that Castro would arm himself with a weapon.” Id. The court of appeal thus concluded that defendant “did not have the requisite mental state ... to be a principal to armed robbery.” Id. At the same time, the majority on the panel concluded that defendant was a principal to the crime of simple robbery, and not merely to a theft, because Tammy Rogers did not “give up the purse of her own will, nor was it merely taken secretly.” Id., 42,302 at 14, 962 So.2d at 1198. Thus, evidence that the victim “was openly and quickly approached by a man in the heavy rain who grabbed her purse, which was in her close proximity,” gave jurors a rational basis for finding “that such a situation was, at the very least, intimidating.” Id. The majority decision accordingly modified defendant’s conviction from armed robbery to simple robbery and remanded the case to the trial court for resentencing in accord with La. R.S. 14:65. In his dissent to the denial of rehearing, Chief Judge Brown emphasized evidence that defendant “drove the car, specifically looked for and identified a victim and immediately after the robbery passed the victim’s check at KFC,” and defendant’s own testimony that “she saw her boyfriend with a ‘silver gun.’” Smith, 42,302 at 1, 962 So.2d at 1198 (Brown, C.J., dissenting from denial or rehearing). In his view, that evidence fully supported the jury’s verdict and the majority had “simply reweighed the evidence which is constitutionally prohibited and reduced the conviction.” Id.
|7As an initial matter, we agree with Chief Judge Brown that viewing the evidence in a light most favorable to the prosecution, as a reviewing court must under the due process standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), a rational trier of fact could find from Castro’s testimony that defendant knew he had a gun and from defendant’s testimony that she saw Castro with a gun when he confronted the victim, that defendant was fully aware Castro would arm himself when they discussed looking for easy targets as she played the aisles in the Wal-Mart parking lot. However, even assuming, arguendo, that rational jurors would interpret the testimony to mean only that defendant observed Castro with a gun at the moment he snatched Tammy Rogers’s purse and that, as appel *296 late counsel argues, she only then realized that Castro had deviated from their plan calling for an “easy snatch” by “in essence, calling an unnecessary audible,” we remain in agreement with the dissent that the evidence at trial fully supported the jury’s verdict that defendant was guilty as a principal to the crime of armed robbery.
Some jurisprudential support exists for the position taken by the court of appeal and defendant that defendant must have subscribed to Castro’s decision to arm himself before he stepped from the car to render her a principal in the offense of armed robbery. See State v. Doucet, 93-1523, p. 6 (La.App. 3rd Cir.5/4/94), 638 So.2d 246, 249 (reducing first degree robbery conviction to simple robbery because “[t]he evidence does not support a conclusion that the defendant knew of the existence of the knife before or during the robbery or that [the co-perpetrator] might lead the victim to believe that he was armed with a dangerous weapon.... Additionally, [the co-perpetrator] testified that the defendant was not aware that he had a knife on his person until after the robbery.”); State v. Smith, 450 So.2d 714, 716-17 (La.App. 4th Cir.l984)(redueing armed robbery conviction to simple robbery because the evidence revealed that the co-perpetrator spontaneously armed himself with a hammer belonging to the victim in the middle of the robbery and used it to intimidate the victim while defendant stood on the other side of the lacounter urging his accomplice to get all of the money but not mentioning the hammer). Both decisions rely on the general rule that “[a]ll principals to a crime are not necessarily guilty of the same grade of the offense. A principal may be convicted of a higher of lower degree of the crime, depending upon the mental element proved at trial.” Smith, 450 So.2d at 717 (citing State v. Holmes, 388 So.2d 722 (La.1980)). Thus, under Smith and Doucet, the requisite intent of a principal who concerns himself in a robbery by aiding and abetting another in the commission of the offense is the intent to commit either armed or simple robbery, and in the latter case, the intent of the co-perpetrator to arm himself before or during the offense may not be imputed to the principal.
However, neither Doucet nor the Fourth Circuit’s Smith, nor the Second Circuit’s decision in the present case for that matter, takes into account a general principle of accessorial liability that when two or more persons embark on a concerted course of action, each person becomes responsible for not only his own acts but also for the acts of the other, including “ ‘deviations from the common plan which are the foreseeable consequences of carrying out the plan.’ ” State v. Smith, 98-2078, p. 7 (La.10/29/99), 748 So.2d 1139, 1143 (quoting 2 Wayne R. LaFave and Austin Scott, Substantive Criminal Law, § 7.5, p. 212 (1986)). The rule has particular application in cases of felony murder. Thus, a simple burglary may turn into an aggravated burglary and then escalate further into a second degree felony murder well beyond the original plan of the defendant or his accomplice who then unexpectedly kills during commission of the underlying felony offense. See, e.g., State v. McFarland, 07-0026, p. 10 (La.App. 5th Cir.5/29/07), 960 So.2d 1142, 1148 (affirming conviction for second degree felony murder in the course of an aggravated burglary because “the fact that the defendant claimed he did not know [the co-perpetrator] was armed does not absolve him from responsibility, as the risk that the unauthorized entry of an inhabited dwelling may escalate into violence and death is a foreseeable consequence of burglary which every party to the offense must accept no matter what he or she actually intended.”)(citing Smith, |998-2078 *297 at 7, 748 So.2d at 1143). An armed robbery planned by defendant may also escalate into a second degree felony murder when co-perpetrator kills to facilitate his escape from the scene. State v. Wiley, 03-0884, p. 14 (La.App. 5th Cir.4/27/04), 880 So.2d 854, 864. Louisiana courts have also given the rule broader application beyond felony murder. See State v. Wix, 02-1493, p. 10 (La.App. 4th Cir.1/15/03), 838 So.2d 41, 48 (defendant guilty of aggravated battery when co-perpetrator shot victim during an armed robbery because “it is foreseeable that an armed robbery victim may be shot during the perpetration of the robbery, particularly when both of the perpetrators, as in the instant case, held weapons on the victim.”); but see State v. 35,409, pp. 9-10 (La.App. 2nd Cir.9/26/01), 799 So.2d 563, 569 (trespassing defendant not guilty of criminal damage to property because co-perpetrator’s use of box cutter to carve initials into swimming pool liner was not a foreseeable consequence of entering the property to use the pool without permission).
Professor LaFave has cautioned against applying the rule of foreseeable deviation too broadly beyond the special context of felony murder doctrine. 2 Wayne R. La-Fave, Substantive Criminal Law, § 13.3(b)(2nd ed. 2002)(“[G]eneral application of the ‘natural and probable consequence’ rule of accomplice liability is unwarranted. A’s guilt as an accomplice to one crime should not per se be a basis for holding A accountable for a related crime merely because the latter offense was carried out by A’s principal, for this as well would result in A’s guilt of a crime as to which he did not have the requisite mental state.”). In fact, some jurisdictions have modified the rules of felony murder by providing a statutory affirmative defense for the principal who participates in the underlying felony without knowledge or good reason that his co-perpetrator is armed and bent on a lethal result. See, e.g., Ark.Code Ann. § 5-10-102(b) (Michie 2002) (affirmative defense to the crime of felony murder if defendant (1) does not commit, solicit or aid in anyway the homicidal act; (2) was not armed with a deadly weapon; (3) “[reasonably believed that no other participant was armed with a deadly weapon;” |inand (4) “[reasonably believed that no other participant intended to engage in conduct that could result in death or serious bodily injury.”); Conn. Gen.Stat. Ann. § 53a-54c (West 2007)(same); Colo. Rev.Stat. 18-3-102(2)(2008) (same, but adding the requirement that the defendant “[ejndeavored to disengage himself from the commission of the underlying crime or flight therefrom immediately upon having reasonable grounds to believe that another participant is armed with a deadly weapon ... or intended to engage in conduct likely to result in death or serious bodily injury.”).
However, Louisiana statutory law does not provide that kind of affirmative defense in any context, and application of the foreseeable deviation rule in the present case does not carry the risk of convicting defendant of an offense for which she did not have the requisite intent. Under present law, armed robbery is a general intent, not specific intent, crime.[2] *298 An offender therefore has the requisite intent when “from the circumstances the prohibited result may reasonably be expected to follow from the offender’s voluntary act, irrespective of any subjective desire on his pai't to have accomplished such result.” State v. Elzie, 343 So.2d 712, 714 (La.1977); R.S. 14:10. Thus, “in the case of armed robbery, when the proof shows that the perpetrator armed with a dangerous weapon causes another to surrender to him whatever was the object of the robbery, the necessary criminal intent has been furnished by the very doing of those criminal acts.” Holmes, 388 So.2d at 727.
In the present case, the evidence at trial showed, and defendant does not dispute, that she and Castro drove around the Wal-Mart parking lot looking for “an easy snatch.” Although by implication they were looking for targets of easy | nopportunity that did not call for excessive force, the offense they contemplated, purse snatching, is a crime of violence, R.S. 14:2(B)(24) that entails misappropriation by the use of force. La. R.S. 14:65.1.[3] *299 Defendant was therefore accountable for Castro’s decision to arm himself with the black powder pistol before he stepped from the car even if she did not know at any point before Castro got out of the car and approached the victim that he had a weapon and would have it in hand when he snatched the victim’s purse, and even if she remained behind in the car while Castro rushed towards the victim’s shopping cart. Castro’s decision to take the gun to increase the odds of success in the event the victim offered unexpected resistance was an entirely foreseeable consequence and inherent risk 1 iaof the original plan to commit a crime of violence by snatching Tammy Rogers’s purse. The crime escalated from purse snatching to armed robbery when the armed Castro rushed at the victim and snatched her purse in a face-to-face confrontation.[4] Although Rogers did not see anything in Castro’s hand (whether held at his side or pointed at her head) and did not testify that she felt threatened or feared for her life, and although Castro insisted that he had used no force or violence directed towards the victim, we agree with the Second Circuit that the circumstances were sufficiently intimidating for a rational trier of fact to find that Castro’s taking amounted to a robbery because an ordinary person in Rogers’s position reasonably could have inferred a threat of bodily harm from the onrushing Castro if she resisted. Cf. United States v. Gipson, 383 F.3d 689, 699 (8th Cir. 2004)(for purposes of 18 U.S.C. § 2113(a), defining bank robbery as the taking “by force and violence, or by intimidation,” the element of intimidation “is satisfied if an ordinary person in the position of a victim teller or bank employee reasonably could have inferred a threat of bodily harm from the robber’s actions.”); State v. Pasek, 691 N.W.2d 301, 306 (S.D.2004)(adopting federal objective standard of intimidation under state statute defining first degree robbery committed by means of force or fear)(citing Gipson).
Thus, even assuming that the jury did not credit Cody’s testimony that Castro held out the black powder pistol aimed at the victim’s head while defendant stood at his side snatching the victim’s purse, the evidence, viewed in a light most | ^favorable to the prosecution, permitted a rational trier of fact to find that Castro *300 had committed an armed robbery and that defendant was a principal to the crime because she counseled and encouraged Castro in the commission of a crime of violence and then shared in the proceeds after fleeing the scene. The decision of the court of appeal is therefore reversed, defendant’s conviction and sentence for armed robbery are reinstated, and this case is remanded to the district court for purposes of execution of sentence.
DECISION OF COURT OF APPEAL REVERSED; CONVICTION AND SENTENCE REINSTATED; CASE REMANDED.
JOHNSON, J., dissents and assigns reasons.
JONES, J., dissents for reasons assigned by JOHNSON, J.

. Judge Benjamin Jones, of the Fourth Judicial District Court, assigned as Justice Pro Tempore, participating in the decision.

. Before the 1983 amendment of R.S. 14:64, armed robbery was a specific intent crime because it required proof of a theft from the victim, i.e., an intent to deprive the victim permanently of his or her personal possessions. See State v. Johnson, 368 So.2d 719, 722 (La.1979). However, the 1983 amendment of R.S. 14:64 substituted “taking” for “theft” and armed robbery thereby became a general intent crime. State v. Gordon, 504 So.2d 1135, 1142, n. 4 (La.App. 5th Cir.1987). However, even under former law, the requisite specific intent was to commit a theft, not to use a dangerous weapon. The latter ele *298 ment has always been a matter of general intent, i.e., the offender intends to arm himself because in fact he arms himself before, during, or immediately after, committing a robbery.

. Other states have taken divergent views of whether the mere snatching of a victim's personal effects without any additional force directed toward the victim constitutes robbery or larceny. See Peter G. Guthrie, Annot., Purse Snatching as Robbery or Theft, 42 A.L.R.3d 1381, 1383 (1972)("[T]he rule prevailing in most jurisdictions [is] that the mere snatching or sudden taking of property from the person of another does not itself involve such force, violence, or putting in fear as will constitute robbery[.]”); see also 3 Wayne R. LaFave Substantive Criminal Law, § 20.3(d), pp. 181-82 (2nd ed. 2003)("The great weight of authority ... supports the view that there is not sufficient force to constitute robbery when the thief snatches property from the owner's grasp so suddenly that the owner cannot offer any resistance to the taking. ”)(footnote omitted).
However, legislatures remain free to denominate taking by sudden snatching as a species of robbery and not of larceny. Thus, Florida defines the offense of robbery by sudden snatching as the taking of money or other property from the victim’s person when "in the course of the taking, the victim was or became aware of the taking.” Fla. Stat. Ann. § 812.131(l)(West 2000); see Brown v. State, 848 So.2d 316 (Fla.App. 2nd Dist.2003). The statute specifically provides that the state need not show that the offender "used any amount of force beyond that effort necessary to obtain possession of the money or other property,” or that the victim offered any resistance or suffered any injury.
Similarly, in Louisiana, the crime of purse snatching is defined as "the theft of anything of value contained within a purse or wallet at the lime of the theft, from the person of another or which is in the immediate control of another, by use of force, intimidation, or by snatching, but not armed with a dangerous weapon.” (emphasis added). The offense constitutes a particular and more serious species of misappropriation with violence when the offender is not armed with a dangerous weapon, i.e., simple robbery in violation of La. R.S. 14:65, because it carries a maximum term of imprisonment of 20 years at hard labor, nearly three times as great as the maximum penalty provided for simple robbery.
However, unlike the Florida statute, R.S. 14:65.1 does not require that the victim know at the time of the taking that his or her property is taken or snatched. It therefore remains possible in Louisiana to "snatch” a victim's purse from her possession without her awareness at the time of the taking. See State v. Anderson, 418 So.2d 551, 552 (La. 1982)(defendant guilty of purse snatching when he grabbed victim's purse placed on floor between her legs as she sat watching a football game unaware of the taking until after it occurred); compare McNeamey v. State, 210 Ga.App. 582, 436 S.E.2d 585 (1993)(evidence that victim was leaning over and unloading groceries into her car from the opposite end of her shopping cart when defendant grabbed her purse from the cart without her knowledge did not support conviction for robbery by snatching; victim learned of the crime only when bystander informed her that defendant had taken her purse). An ano *299 malous consequence of the rule in Anderson is that a defendant may commit the more serious offense of purse snatching under circumstances in which he does not commit the less serious offense of simple robbery because the offense did not entail the use of any more force than the act of snatching or any act of intimidation to separate the victim from her property.

. Even assuming that jurors did not credit the testimony of Cody Duos that Castro raised his gun to the head of the (unaware) victim, R.S. 14:64(A), defining the crime of armed robbery, does not require that the offender “use” a dangerous weapon during commission of the offense, or accomplish the robbery by means of a dangerous weapon; it requires proof only that the offender was “armed” during the offense. Compare Bailey v. United States, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)(18 U.S.C. § 924(c)(1), which proscribes "use” of a firearm in relation to a drug trafficking crime requires proof that the defendant actually employed a gun in relation to the drug offense.); cf. Ga.Code Ann. § 16-8-41(a)(2007)("A person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon, or any replica, article, or device having the appearance of such weapon.”).
In the present case, and in terms of the potential danger to Tammy Rogers, it made little difference whether Castro pointed his pistol at the victim’s head as he snatched her purse or held it at the ready at his side. In either case, he was “armed” during commission of an offense which involved misappropriation accompanied by the use of force or intimidation.