**NOT DESIGNATED FOR PUBLICATION**

STATE OF LOUISIANA
COURT OF APPEAL
FIRST CIRCUIT

2019 KA 0467

STATE OF LOUISIANA

VERSUS

BENJAMIN BAILEY

Judgment rendered___**DEC 2 7 2019**___

* * * * *

On Appeal from the
Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
No. 03-14-0337, Sec. IV

The Honorable Bonnie P. Jackson, Judge Presiding

* * * * *

Hillar C. Moore, III
District Attorney
Baton Rouge, LA

Attorney for Plaintiff/Appellee
State of Louisiana


Lieu T. Vo Clark
Mandeville, LA

Attorney for Defendant/Appellant
Benjamin Bailey

* * * * *

**BEFORE: McCLENDON, WELCH, AND HOLDRIDGE, JJ.**

**HOLDRIDGE, J.**

The defendant, Benjamin Bailey, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1.[1] He pled not guilty and, following a jury trial, was found guilty as charged. The defendant filed a motion for postverdict judgment of acquittal, which was denied. He was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant now appeals, designating two assignments of error. We affirm the conviction and sentence.

## FACTS

On the evening of November 6, 2012, Derrick Marionneaux, his wife Demetria, and their teenage daughter were at home on Wyandotte Street in Baton Rouge. Around 6:30 p.m., there was a loud gunshot outside, then the front door "flew open," according to Demetria. Derrick was sitting at the table. Demetria saw two people standing in the doorway with ski masks on. Demetria heard gunshots, grabbed her daughter, and they ran out the back of their home and to a neighbor's house. Three gunmen fired through the open door at Derrick. Derrick was struck several times. He was brought to Earl K. Long Hospital, where he died.

The three perpetrators were later identified as the defendant, Juan Herbert (the defendant's cousin), and Derian Bailey (the defendant's brother, a minor at the time of the shootings, but an adult at trial).[2] Juan was charged with second degree murder. He entered into a plea agreement with the State, whereby in exchange for his truthful testimony at trial, he would be allowed to plead guilty to manslaughter. Juan testified that on the day of the shootings, he, the defendant, and Derian went

---

[1] Co-defendants Juan Herbert and Derian Bailey were also indicted for second degree murder. The defendant's trial was severed from his co-defendants.

[2] Juan testified that Derian was the defendant's brother. Juan also testified that the defendant was his cousin, but Derian was not his (Juan's) cousin.

2

to Juan's apartment on Pampas Street (one street north of Wyandotte Street). They were driven there by Tameka Hawkins. According to Detective Logan Collins, with the Baton Rouge Police Department, the defendant and Tameka were dating.

Juan testified that at his apartment, they retrieved an AK-47 rifle, a shotgun, and a handgun. Later that day, the three walked to Derrick's house and knocked on the door. Juan had the AK-47, the defendant had the shotgun, and Derian had the handgun. Juan heard someone in the house say that he was coming. Juan then kicked the door in and shot Derrick. Juan was not sure how many times he fired. Juan was shot, apparently accidentally, four times in his back and side by Derian. According to Juan, the three of them then went to a dumpster in the parking lot of Acadian Superette (Superette), on the corner of North Acadian Thruway and Charles Street.

Juan testified that following this, Tameka drove the three to the hospital (Baton Rouge General Hospital) where Juan was treated for his injuries. Detectives talked to Juan while he was at the hospital. Juan indicated that he lied to them when asked how he got shot. He indicated he was with his cousins on Plank Road and got shot in a drive-by shooting. About a week later, detectives returned to the hospital to talk to Juan. Juan testified that he gave them a different account of what had transpired. He told the detectives he was with "Bryson and DB" and they had discussed robbing someone. Juan indicated at trial that the truth was that he, the defendant, and Derian were armed and went to Derrick's house. Juan admitted that he was the one who shot Derrick. Juan had prior convictions for illegal use of a weapon and simple burglary of an inhabited dwelling.

Shawanda Johnson Mack testified at trial that on the evening of November 6, 2012, she drove to the Superette with her sister and parked on the side of the store where the dumpster was. Her sister went into the store and Shawanda stayed

3

in her car. According to Shawanda, while she was waiting, the defendant approached her, leaned into the car, and hugged her. Shawanda stated she found this shocking because, even though she knew the defendant from the neighborhood, they had never spoken before. She had never hung out with or socialized with the defendant and was stunned that he would hug her. According to Shawanda, she heard gunshots "right after" they hugged. Shawanda looked toward the dumpster and saw Juan, whom she knew, and some other person whom she did not know. Shawanda thought that Juan was holding a double-barrel shotgun. Shawanda stated that Juan was limping and the other person was holding him up. Shawanda saw one of them drop a jacket and a hat by the dumpster. Shawanda stated the two males then walked through a pathway across the street from the Superette, and the defendant followed them. Shawanda's sister returned to the car and, shortly thereafter, Shawanda's brother called her on her cell phone and told her that Derrick had been shot. Derrick was Shawanda's cousin. That same night, Shawanda informed the police about the items she saw being dropped; she also gave a recorded interview to detectives. Her statement was played for the jury.

Detective Collins obtained video surveillance footage from the Superette of activity that occurred inside and outside of the store on the night of the shootings. The footage showed three people looking in the trunk of Tameka Hawkins's car. Minutes later, these same three people were seen walking down Charles Street. About twenty-five minutes later, these three walked back to the Superette and to the dumpster on the side of the store. The defendant was seen going into the store, then leaving the store and walking up to Shawanda's car. The surveillance videos were played for the jury.

4

Detective Zac Woodring, with the Baton Rouge Police Department, testified that when he arrived at the scene of the shootings, it appeared there were three different shooters since there were three types of shell casings at the house. Detective Woodring noted there were .22 caliber casings in the front yard and front porch area and one in the living room. There were two .762 caliber casings in the living room. There was also shotgun wadding (a plastic piece that separates from the shotgun shell when fired) under an end table in the living room. Detective Woodring testified the front door sustained significant damage and that multiple pellets were found near it, which was consistent with a shot being fired from a shotgun. Detective Woodring further noted that the police found a blue jacket, a pink ski mask, and a black baseball cap by the dumpster at the Superette; and they found a blue ski mask in the field directly across the street from the dumpster. The DNA of the defendant, Juan, and Derian were found on these items.

The defendant did not testify at trial.

## ASSIGNMENTS OF ERROR NOS. 1 and 2

In these two related assignments of error, the defendant argues, respectively, that the trial court erred in denying the motion for postverdict judgment of acquittal and that the evidence was insufficient to support the conviction. Specifically, the defendant contends that his identity as one of the perpetrators was not established at trial.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789,

5

61 L.Ed.2d 560 (1979). See La. Code Crim. P. art. 821(B); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. See **State v. Patorno**, 2001-2585 (La. App. 1 Cir. 6/21/02), 822 So.2d 141, 144. Furthermore, where the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. **State v. Cockerham**, 2017-0535 (La. App. 1 Cir. 9/21/17), 231 So.3d 698, 703, writ denied, 2017-1802 (La. 6/15/18), 245 So.3d 1035.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of defendant. **State v. Mickelson**, 2012-2539 (La. 9/3/14), 149 So.3d 178, 182-83. The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact. **State v. Dickerson**, 2016-1336 (La. App. 1 Cir. 4/12/17), 218 So.3d 633, 638, writ denied, 2017-1147 (La. 8/31/18), 251 So.3d 1062. Deliberately pointing and firing a deadly weapon at close range indicates specific intent to kill. **State v. Robinson**, 2002-1869 (La. 4/14/04), 874 So.2d 66, 74, cert. denied, 543 U.S. 1023, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004).

The parties to crimes are classified as principals and accessories after the fact. La. R.S. 14:23. Principals are all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime. La. R.S. 14:24. Only those persons who knowingly participate in the planning or execution of a crime are principals. An individual may be convicted as a principal only for those crimes for which he personally has the requisite mental state. **State v. Wright**, 2001-0322 (La. 12/4/02), 834 So.2d 974, 983, cert. denied, 540 U.S. 833, 124 S.Ct. 82, 157 L.Ed.2d 62 (2003). The State may prove a defendant guilty by showing that he served as a principal to the crime by aiding and abetting another. **State v. Huey**, 2013-1227 (La. App. 1 Cir. 2/18/14), 142 So.3d 27, 30, writ denied, 2014-0535 (La. 10/3/14), 149 So.3d 795, cert. denied, __ U.S. __, 135 S.Ct. 1507, 191 L.Ed.2d 443 (2015). Further, when two or more persons embark on a concerted course of action, each person becomes responsible for not only his own acts but also for the acts of the other. See **State v. Smith**, 2007-2028 (La. 10/20/09), 23 So.3d 291, 296 (per curiam).

In his brief, the defendant avers that Juan provided various accounts about the shooting of Derrick. Juan, for example, told the police at the hospital he had been shot in a drive-by shooting. Later, Juan, implicated "Bryson" and "DB" in the shooting. (At trial, Juan indicated Bryson and DB were the same person and that Bryson had nothing to do with the shooting). Then three years later, according to the defendant, Juan, faced with a second degree murder charge, changed his story again. The defendant also points out that Juan entered into a plea deal with the State wherein he pled guilty to manslaughter and would be given a twenty-five to thirty-year sentence in exchange for his testimony. Finally, the defendant argues

7

he could not have been involved in the shooting because Shawanda testified the defendant was by her car at the Superette when she heard shots being fired.

In its brief, the State argues Juan's testimony regarding the defendant's participation in Derrick's murder was consistent with and corroborated by the evidence and testimony at trial. The State points out that Shawanda indicated she had heard the gunshots just prior to seeing Juan near the dumpster. Further, the State contends, the evidence showed that Derrick was murdered before the defendant's encounter with Shawanda in the Superette parking lot.

Two surveillance videos from the Superette on the night of the shooting were introduced at trial and played for the jury. In the surveillance video that shows the dumpster and the inside of the Superette, a light colored sedan is seen pulling into the parking lot. (This video has nine panes, with each pane depicting a different camera angle; most of the activity can be seen in the first pane). The driver of the car was identified as Tameka Hawkins, the defendant's girlfriend. Three people get out of the car, but not Tameka. As one of them, identified as Juan, walks into the store, the two other individuals open the trunk of the car and appear to be retrieving items from it. Juan is wearing a black and red hoodie sweatshirt. About two minutes later, Juan leaves the store and Tameka goes in the store. Juan walks to the car, and the three individuals stand by the back of the car for several minutes with the trunk open. Tameka then leaves the store and returns to the car. As she gets in the car, one of the three individuals closes the trunk. The three individuals (including Juan) then walk west down Charles Street, in the direction of Derrick's house. For about twenty-four minutes, these individuals are not seen on the surveillance video. Then at about thirty-two minutes into the video, two males enter the video frame from the south side of the Superette and walk to the dumpster in the parking lot. A third male with something in his right

8

hand is seen walking a few feet behind the first two males. About a minute later, one of the males leaves the area of the dumpster and walks into the store. This person is the defendant, who was clearly identified on the in-store surveillance cameras. He is wearing a black sweatshirt. The defendant walks around the store for less than a minute, does not buy anything, then leaves.

The other Superette surveillance video captured activity outside the front of the store. The camera was near Acadian Thruway and pointed in a southerly direction, toward Charles Street. At about ten seconds into this video, three people enter the frame from the north, or from where Wyandotte Street is; two are walking together and the third person is walking several feet behind them. This person walking behind the other two has something in his right hand and appears to struggle as he walks. The three walk around the side of the store and head toward the dumpster. As pointed out by Detective Collins, this video coincides with the last several minutes of the Superette video with the multiple panes (of the dumpster and inside the store). In other words, both these surveillance videos represent at least two different cameras angles of the same three people and their actions. At about 47 seconds into this video, Shawanda pulls up in her car and parks on the same side of the Superette as the dumpster. The back of her car is facing Charles Street. Her sister gets out of the car and goes into the store. About twenty seconds later, the defendant walks around the side of the store where the dumpster is and goes in the store. Less than a minute later, the defendant walks out of the store and approaches the driver's side of Shawanda's car. The defendant appears to lean in, then talk to Shawanda for several seconds. Shortly thereafter, Shawanda's sister returns to the car with groceries, and the defendant walks away, heading in the direction of Acadian Thruway.

9

It appears, thus, that the surveillance videos showed Shawanda arriving at the Superette *after* the shooting at Derrick's home. That is, the three perpetrators could be seen walking back to the Superette (after having left the Superette for about twenty-five minutes) and then seen around the side of the store by the dumpster, before Shawanda had even arrived. Juan was limping and holding what could have been a gun in his right hand. When Shawanda pulled into the parking lot, the three perpetrators, including the defendant, were by the dumpster, tossing items.

The foregoing events are in accord with the time of the shooting, and with Shawanda's testimony and statement. Demetria, Derrick's wife, testified at trial that she returned home with fast food at about 6:15 p.m. Derrick sat down at the table to eat. While he was eating, Demetria heard a shot and the front door "flew open." The first 911 call was at 6:34 p.m. This caller said there were three guys at the house with "bandanas or something" over their faces. Demetria's 911 call was at 6:35 p.m., which was made from a neighbor's house after Demetria and her daughter ran out the back of the house, jumped the fence, and ran to a neighbor's house. Demetria banged on the door, asking to use the phone because someone had just invaded their home. The neighbor did not let Demetria inside, but gave her a phone to call 911. The shooting, thus, likely took place between 6:20 p.m. and 6:30 p.m. Shawanda testified at trial that she arrived at the Superette around 6:30 p.m. or 6:45 p.m. In her recorded interview, Shawanda stated she thought she had arrived at the Superette about "seven something."

From the foregoing, it becomes apparent that whatever gunshots Shawanda thought she may have heard while in the Superette parking lot talking to the defendant, were not the gunshots that had occurred minutes before at Derrick's house. The record indicates that at least ten shots were fired in and around

10

Derrick's house. In her interview, Shawanda said she heard six or seven shots. She also said that two seconds after the defendant was by her car, she heard what "sounded like a pop gun." She then saw at the dumpster two guys, one bent down who she recognized as Juan Herbert, and it looked like he had a double-barrel shotgun On direct examination, Shawanda testified that when the defendant was by her car, she heard six or eight gunshots. Then immediately after, "maybe two seconds," she saw Juan heading toward the dumpster being held up by someone. Thus, if Juan's version of events, as told at trial, is believed; that is, if he, the defendant and Derian were all at Derrick's house when Juan shot Derrick, then it would have been impossible for the shots that Shawanda heard to have been the shots that were fired at Derrick's house by the three perpetrators. The dumpster in the Superette parking lot is around the corner from Derrick's house. A walking Juan, and a hurt, limping walking Juan at that (after being shot four times on Derrick's porch by Derian), could not have gone from Derrick's house to the dumpster in two seconds. Shawanda was asked on direct examination, "Juan was right there when you heard the gunshots, correct?" She replied, "Yes, ma'am."

On cross-examination, Shawanda said she heard shots after the defendant had leaned into her car. On redirect examination of Shawanda, this exchange took place:

Q. Okay. You also said that Ben embraced you, correct?
A. Yes, ma'am.
Q. And you were seated in your vehicle.
A. Yes, ma'am.
Q. And then you heard two shots.
A. Yes, ma'am.

At the 34:25 mark of the surveillance video of the dumpster and interior of the Superette, a flash of light can be seen by the dumpster, followed by another flash near the ground a few feet away. About five or six seconds later, another

11

flash of light can be seen in the street, several feet from the dumpster. A few seconds after this, another flash can be seen across the street from the dumpster. During this time, Juan and Derian were near the dumpster, and the defendant was out of the frame, either in the store or talking to Shawanda by her car. These bright bursts of light appeared to be the muzzle flashes from a gun or guns. A shell casing was found in the field across from the Superette. This evidence suggests that Derian and/or Juan fired their weapons after they had left Derrick's house. The gunshots by the dumpster could have been intentional or an accidental discharges. This would explain Shawanda's hearing gunfire while the defendant was at her car.

At any rate, Juan's testimony placed the defendant at Derrick's house at the time of the shooting, and the jury chose to believe this testimony. His testimony in fact established that it was the defendant who had the shotgun when Derrick was shot. Shotgun wadding found in the living room under an end table clearly indicated the shotgun had been fired.

Further, Juan's testimony of the defendant's involvement in the shooting was corroborated by other evidence. The video surveillance footage showed the defendant, Juan, and Derian together at all times. The only time the defendant separated from the other two was *after* the shooting when he was with Juan and Derian by the dumpster. The defendant left them briefly to go in the store, then left the store and hugged and talked to Shawanda. Shawanda made clear in both her interview and trial testimony that she was shocked when the defendant hugged her. She knew the defendant from the neighborhood, but they never hung out together or talked to each other. Any juror could have rationally concluded the defendant went in the store to get his face on the surveillance camera, and that he hugged Shawanda in order to create some semblance of an alibi.

12

The defendant was also with his brother, Derian, and Juan at the hospital, after Derrick was shot and killed, when Juan was there being treated for his gunshot wounds. The major contributor of the DNA found on the black baseball cap and the inside of the pink ski mask was the defendant. These items were found by the Superette dumpster. The major contributor of the blue ski mask found by the dumpster was Derian. A stain of presumptive blood found on the blue ski mask belonged to Juan. The two major contributors of the DNA found on the blue sweatshirt jacket near the dumpster were the defendant and Juan. All of this evidence established that the defendant, Juan, and Derian were together and remained together before, during, and after the shooting.

Any lack of forensic evidence and/or conflicting accounts of the defendant's whereabouts at the time Derrick was shot and killed was brought out at trial and addressed by defense counsel. Despite this, the jury chose to believe the eyewitness testimony of Juan. Positive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. See **State v. Hughes**, 2005-0992 (La. 11/29/06), 943 So.2d 1047, 1051; **State v. Davis**, 2001-3033 (La. App. 1 Cir. 6/21/02), 822 So.2d 161, 163-64.

The jury that found the defendant guilty of second degree murder was fully informed of the inconsistencies between Juan's trial testimony and his previous statements to authorities. In fact, much of the cross-examination of Juan` by defense counsel pointed out the inconsistencies. Defense counsel elicited testimony from Shawanda, which most directly established the defendant's theory of the case, which was that the defendant was with Shawanda at the Superette at the time Derrick was shot and killed. The trier of fact, however, makes credibility determinations and may, within the bounds of rationality, accept or reject the

13

testimony of any witness; thus, a reviewing court may impinge on the fact finder's discretion "only to the extent necessary to guarantee the fundamental protection of due process of law." **State v. Mussall**, 523 So.2d 1305, 1310 (La. 1988). See **State v. Weary**, 2003-3067 (La. 4/24/06), 931 So.2d 297, 311-12, cert. denied, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006).

In this case, the jury was informed of the method of identification to which it could attach whatever weight they deemed appropriate. Since the defendant's counsel urged the defense of misidentification to the jury, the question of reliability was presented to the jury for consideration. **Cockerham**, 231 So.3d at 705. Based on the testimonial and physical evidence, the jury found the defendant guilty, which was a direct refutation of the defendant's alleged alibi. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. **State v. Talley**, 2018-1300 (La. App. 1 Cir. 5/9/19), 277 So.3d 397, 403. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. **State v. Mitchell**, 99-3342 (La. 10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. **State v. Nixon**, 2017-1582 (La. App. 1 Cir. 4/13/18), 250 So.3d 273, 291, writ denied, 2018-0770 (La. 11/14/18), 256 So.3d 290. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. **State v. Higgins**, 2003-1980 (La. 4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).

14

When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. See **State v. Moten**, 510 So.2d 55, 61 (La. App. 1 Cir.), writ denied, 514 So.2d 126 (La. 1987). The jury heard all of the testimony and viewed the evidence presented to it at trial and found the defendant guilty. In finding the defendant guilty, the jury clearly rejected the defense's theory of misidentification. See **Moten**, 510 So.2d at 61. Although there were inconsistencies in the testimony, there was sufficient evidence for the jury to have found the necessary elements of second degree murder proved beyond a reasonable doubt. See **Weary**, 931 So.2d at 312. While the defendant might not have fired the fatal gunshot, he was a principal to the crime because he embarked on a concerted course of action with Juan and Derian and, as such, each person became responsible for not only his own acts but also for the acts of the others. See **State v. Smith**, 2007-2028 (La. 10/20/09), 23 So.3d 291, 296-97 (per curiam).

After a thorough review of the record, we find the evidence negates any reasonable probability of misidentification and supports the jury's unanimous guilty verdict. We are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of the second degree murder of Derrick Marionneaux. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam).

The trial court did not err in denying the defendant's motion for postverdict judgment of acquittal. Accordingly, these assignments of error are without merit.

15

## CONCLUSION

For the foregoing reasons, the defendant's conviction and sentence are affirmed.

**CONVICTION AND SENTENCE AFFIRMED.**