STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2021 KA 0287

STATE OF LOUISIANA

VERSUS

JORDAN CYPRIAN

Judgment Rendered: DEC 2 2 2021

Appealed from the
Twenty-first Judicial District Court
In and for the Parish of Tangipahoa
State of Louisiana
Docket Number 1603119

Honorable Jeffrey S. Johnson, ad hoc

*************

| | |
|---|---|
| Scott M. Perilloux | Counsel for Appellee, |
| Patricia Parker Amos | State of Louisiana |
| Brett Sommer | |
| Amite, LA | |
| | |
| Rachel Yazbeck | Counsel for Defendant/Appellant, |
| New Orleans, LA | Jordan Cyprian |

*************

BEFORE: WHIPPLE, C.J., PENZATO, AND HESTER, JJ.

**WHIPPLE, C.J.**

The defendant, Jordan Cyprian, was charged by grand jury indictment with second degree murder, a violation of LSA-R.S. 14:30.1.[1] He pled not guilty. He moved to suppress all statements and physical evidence, but the motion was denied by the trial court. He applied to this court for supervisory relief from the ruling, but the writ application was also denied. State v. Cyprian, 2019-0093 (La. App. 1st Cir. 3/6/19), 2019 WL 1084231 (unpublished writ action).[2] The matter then proceeded to trial before a jury. On the second day of trial, he moved for a mistrial, but the motion was denied. He applied to this court and the Louisiana Supreme Court for supervisory relief from the ruling, but writs were denied. State v. Cyprian, 2020-0643 (La. App. 1st Cir. 7/23/20), 2020 WL 4218772 (unpublished writ action) & 2020-00937 (La. 7/24/20), 300 So. 3d 402. Following trial, he was found guilty by a unanimous verdict. He was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. He now appeals, challenging the sufficiency of the evidence, the ruling on the motion to suppress, and the denial of his motion for mistrial. For the following reasons, we affirm the defendant's conviction and sentence.

## FACTS

On November 25, 2016, at approximately 1:30 a.m., the Hammond Police Department was alerted regarding the shooting of the victim, Stephen Christopher Vance, on Rue Cannes in the Villa West subdivision (Villa West). Broken glass and blood at the scene indicated the victim may have been pushed from a vehicle. Additionally, a Nissan vehicle key was recovered at the scene. At approximately

---

[1]Eric Newman was separately charged by grand jury indictment and was convicted of first-degree murder in connection with the same offense. This court affirmed his conviction and sentence. State v. Newman. 2019-0361 (La. App. 1st Cir. 9/27/19), 289 So. 3d 59, writ denied, 2019-01890 (La. 1/28/20), 291 So. 3d 1060.

[2]Although a pretrial determination does not absolutely preclude a different decision on appeal, judicial efficiency demands that this court accord great deference to its pretrial decisions on admissibility unless it is apparent, in light of a subsequent trial record, that the determination was patently erroneous and produced an unjust result. State v. Burgess, 2019-1603 (La. App. 1st Cir. 9/22/20), 315 So. 3d 279, 282 n.1, writ denied, 2020-01189 (La. 2/17/21), 310 So. 3d 1148.

4:00 a.m., the victim died. He had suffered a fatal gunshot wound to the right temple area of his head. The shot was fired less than two feet from his face.

At 5:33 a.m., the Hammond Police Department was notified by the Tangipahoa Parish Sheriff's Office that an abandoned Nissan vehicle was located in a vacant lot off of Old Baton Rouge Highway. The front driver's side window of the car was shattered, and there was blood in the car. There were also bloody items on the ground near the car. Although the car was wet with dew, its door handles were dry and clean as if they had been wiped with a towel. The National Crime Index Computer indicated the registered owner of the car was Thomas Smith. Smith testified at trial that the victim was his roommate and best friend, and that he allowed the victim to borrow the vehicle to go to work on November 24, 2016.

Fredenisha Williams, who is the sister of Robert Rheams, III, (a friend of the defendant) and was also Eric Newman's girlfriend at the time of the offense, testified at trial. On Thanksgiving evening in 2016, Williams was in bed with Newman when the defendant "bust[ed] in[to] the room." According to Williams, the defendant said "he want[ed] to go on a lick." Williams testified that a "lick" was some kind of criminal activity. Newman and the defendant then went outside. Subsequently, Rheams arrived, and all three men left for a couple of hours. When they returned, Newman was bloody. He also had a phone in his possession that he did not have in his possession when he left. The next day, Williams heard the defendant arguing with Newman. According to Williams, the defendant stated he had to let "Money" know "that it was a body on this gun."

At trial, the State played a November 28, 2016 recorded statement from the defendant. The defendant was questioned concerning what he knew about the murder in Villa West. He stated that on the night of the murder, he was keeping a .45 caliber Ruger handgun for "Money" while he was at work. The gun had two bullets in it. The defendant became thirsty and decided to go to Circle K. Newman and

3

"Little Rob" (later identified as Rheams) walked with the defendant to Circle K. According to the defendant, Newman wanted to hold the gun, and the defendant gave it to him. Newman kept saying "gotta move." The defendant also claimed Newman said "we are going to rob somebody," and "cocked" the weapon.

The defendant indicated that after he got a drink and left the Circle K store, he became hungry and went back to the store with Newman and Rheams. The defendant denied discussing robbing anyone on the way to the store. According to the defendant, when he exited the Circle K, he discovered Newman and Rheams had left without him. The defendant claimed he then saw Newman and Rheams in the victim's car with the victim. Newman was in the passenger seat. Rheams was seated behind Newman. The defendant stated he saw Newman pointing a gun at the victim. The defendant then heard a "boom." He claimed Rheams jumped out of the vehicle and ran off before the gun went off. The defendant also claimed Newman pushed the victim's body out of the vehicle and drove off in the vehicle.

According to the defendant, he then ran back to his home on Klein Road and[3] Newman and Rheams were already there "plotting their s---." Newman had the victim's phone in his hand. The defendant indicated he told Newman, "man you, stupid man you kept it." The defendant stated Newman replied "this is my fourth one." Newman and Rheams left approximately five minutes later in the victim's car with bleach and a towel. The defendant claimed Newman and Rheams subsequently returned with the gun. The defendant stated the weapon had been "cleaned" and "smell[ed] like bookoo [sic] bleach." He claimed Rheams subsequently called him and told him "they killed somebody with the gun." The defendant further claimed Rheams told him to get rid of the weapon. The defendant stated he gave the weapon back to "Money."

---

[3]The record also references "Klein Road" as "Kline Road."

## SUFFICIENCY OF THE EVIDENCE

In assignment of error number 1, the defendant contends the evidence was insufficient to support the conviction because the State failed to prove he was a willing participant in the armed robbery relied upon to make him a principal to the murder. The defendant argues that his codefendant[4] testified that he and the defendant decided not to commit a robbery before they reached the store. He further argues Eric Newman acted on his own when he flagged down the victim's car. Lastly, he argues he did not participate in the destruction of evidence.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); see also LSA-C.Cr.P. art. 821(B); State v. Mussall, 523 So. 2d 1305, 1308-09 (La. 1988). The Jackson standard, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. State v. Watts, 2014-0429 (La. App. 1st Cir. 11/21/14), 168 So. 3d 441, 444, writ denied, 2015-0146 (La. 11/20/15), 180 So. 3d 315.

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When analyzing circumstantial evidence, Louisiana Revised Statute 15:438 provides that, in order to convict, the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. The facts then established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient

---

[4]The defendant references the testimony of Rheams in connection with this argument. However, Rheams was not a codefendant in this matter.

for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Watts, 168 So. 3d at 444.

All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. LSA-R.S. 14:24. However, the defendant's mere presence at the scene is not enough to "concern" him in the crime. Only those persons who knowingly participate in the planning or execution of a crime may be said to be "concerned" in its commission, thus making them liable as principals. A principal may be connected only to those crimes for which he has the requisite mental state. State v. Neal, 2000-0674 (La. 6/29/01), 796 So. 2d 649, 659, cert. denied, 535 U.S. 940, 122 S. Ct. 1323, 152 L. Ed. 2d 231 (2002). However, "[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention." State v. Anderson, 97-1301 (La. 2/6/98), 707 So. 2d 1223, 1225 (per curiam) (quoting 2 W. LaFave, A. Scott, Substantive Criminal Law, § 6.7, p. 138 (West 1996)); State v. Clay, 2011-1974 (La. App. 1st Cir. 5/3/12), 2012 WL 1564626, *2, writ denied, 2013-0287 (La. 6/14/13), 118 So. 3d 1084.

Louisiana Revised Statutes 14:30.1, in pertinent part, provides:

A.    Second degree murder is the killing of a human being:

. . .

(2) When the offender is engaged in the perpetration or attempted perpetration of … armed robbery[.]

Louisiana Revised Statutes 14:64, in pertinent part, provides:

A.    Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.

Rheams testified at trial. At the time of the offense, he was sixteen years old. Rheams and the defendant had been friends since they were approximately ten years old. On Thanksgiving Day of 2016, Rheams was visiting relatives at his cousin's house. The defendant called Rheams from Rheams's house and asked Rheams to meet him there. When Rheams arrived at his home, Newman was also present with the defendant. Rheams had only known Newman for a couple of months. He stated that Newman was "tailing" Rheams's sister.

Newman and the defendant started talking to Rheams about "hitting a lick." Rheams testified that "hitting a lick" was a reference to "robbing somebody or just doing something outlaw." Newman wanted to get a car from the robbery. According to Rheams, the defendant gave Newman a loaded .45 caliber gun.

At approximately midnight, Rheams, Newman, and the defendant began walking to a nearby Circle K store together. According to Rheams, after leaving the store, Newman still wanted to "hit a lick," but Rheams and the defendant "wasn't messing with it." Rheams, however, answered affirmatively when asked if "the intent was just to do a robbery" and "that was the intent all night[.]"

Thereafter, at a stop sign going into Villa West, Newman told the defendant to lay on the side of the road and "act like something was wrong with him" or "act like he was passed out." Newman then tried to flag down a passing car. The first car that came to the stop sign did not stop.

The defendant was still lying in the road when a second car, driven by the victim, stopped. The victim offered to call 911 and handed Newman a bottle of water. The victim also offered to give Rheams, Newman, and the defendant a ride "to back where [they were] going." Newman got into the front of the car. Rheams got into the back of the car. The defendant continued to lay on the ground. After the victim began driving, Newman told him to put the vehicle into park. The victim complied. The victim did not comply, however, when Newman told him to get out

7

of the car. The victim told Newman and Rheams that he was going to drop them back from where he had picked them up. The victim drove out of Villa West. The victim also told Newman "[the victim] wasn't going to give [Newman] nothing." Newman replied, "well, you ain't going to give me nothing, then I'm going to have to kill you." Rheams claimed he exited the vehicle at this point and heard a gunshot after Newman and the victim drove off.

Thereafter, Newman returned with the vehicle and threatened Rheams "to get back in the car." Rheams got into the car and the men drove off. Rheams stated the defendant "[came] out from nowhere" and also got into the vehicle. Newman dropped off Rheams and the defendant at Klein Road Trailer Park, and they walked to Rheams's home.

Subsequently, Newman walked into Rheams's home. Rheams and the defendant asked Newman why he had killed the victim. Newman did not answer. The defendant then took back the gun from Newman. Newman asked either Rheams or the defendant to "clean the car." The defendant gave Newman some towels from Rheams's laundry room. Rheams gave Newman some bleach. Thereafter, Rheams and Newman went back to the car stolen in the robbery. Newman threw items from the car into the woods. Rheams sprayed bleach on the door handles. Rheams indicated the defendant's responsibility was to get rid of the gun.

Thereafter, Rheams and the defendant went to the house of Rheams's cousin's girlfriend. When they returned to Rheams's house, Newman was burning clothes.

Any rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant aided and abetted in the commission of the robbery that resulted in the victim's death.

Williams testified that the defendant came to her bedroom to get Newman "to go on a lick." Although Rheams testified that after leaving the store, Newman still wanted to "hit a lick," while Rheams and the defendant "wasn't [sic] messing with it," Rheams further testified that the defendant gave Newman the gun used in the robbery, which resulted in the victim's death, with full knowledge that Newman wanted to commit a robbery to get a car. Further, the defendant only took back the gun from Newman *after* the robbery and murder. He did not leave the scene before the victim stopped and he did nothing to warn the victim. Instead, the defendant's participation by feigning unconsciousness on the side of the road caused the victim to stop his vehicle and facilitated the criminal acts ultimately resulting in the murder of the victim. See State v. Smith, 2007-2028 (La. 10/20/09), 23 So. 3d 291, 296 (*per curiam*) ("a general principle of accessorial liability [is] when two or more persons embark on a concerted course of action, each person becomes responsible for not only his own acts but also for the acts of the other, including 'deviations from the common plan which are the foreseeable consequences of carrying out the plan.' The rule has particular application in cases of felony murder. Thus, a simple burglary may turn into an aggravated burglary and then escalate further into a second degree felony murder well beyond the original plan of the defendant or his accomplice who then unexpectedly kills during commission of the underlying felony offense.) (Citations omitted).

Additionally, the defendant's argument that he did not participate in the destruction of evidence is disingenuous. While the defendant may not have personally "cleaned" the car taken in the robbery and involved in the murder, he disposed of the weapon used in connection with both of those crimes. Accordingly, even if the defendant did not intend for the victim to be killed, he is nonetheless guilty of second degree murder under LSA-R.S. 14:30.1(A)(2). See State v. Grant, 623 So. 2d 204, 207 (La. App. 2nd Cir.), writ denied, 629 So. 2d 400 (La. 1993) ("[a]

9

reasonable juror viewing the evidence in the light most favorable to the prosecution could have found beyond a reasonable doubt that Grant aided and abetted in the commission of the robbery that resulted in [the victim's] death. The jury easily could have determined that the taking of the car keys was part of the entire incident. Thus, even if Grant did not intend for the victim to be killed, he is nonetheless guilty of second degree murder under LSA-R.S. 14:30.1(A)(2).").

In reviewing the evidence, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See State v. Ordodi, 2006-0207 (La. 11/29/06), 946 So. 2d 654, 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. State v. Calloway, 2007-2306 (La. 1/21/09), 1 So. 3d 417, 418 (*per curiam*). In accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder, a court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law. See State v. Mire, 2014-2295 (La. 1/27/16), 269 So. 3d 698, 703 (*per curiam*).

This assignment of error lacks merit.

## MOTION TO SUPPRESS

In assignment of error number 2, the defendant contends his statements were the product of evidence obtained during the unlawful stop of Jamonte Felder, a friend of the defendant. He argues the stop was unlawful because it was unsupported by any reasonable suspicion to justify the stop. He further argues his statements were derived from the unlawful stop and are "fruit of the poisonous

10

tree."[5]

Initially, we note the defendant cannot assert violation of Felder's Fourth Amendment rights. Rights under the Fourth Amendment are personal in nature. As such, they may be enforced by exclusion of evidence only at the instance of a person whose own protection was infringed by the search or seizure. It is axiomatic, however, that the defendant may assert violation of his own Fourth Amendment rights. State v. Pennison, 99-0466 (La. App. 1st Cir. 12/28/99), 763 So. 2d 671, 676, writs denied, 2000-1105, 2000-2308 (La. 10/27/00), 772 So. 2d 122, 658, & 2000-0298 (La. 11/3/00), 772 So. 2d 663.

Louisiana Constitution, Article I, § 5 guarantees that "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy." This Article further guarantees that "[a]ny person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court." See Pennison, 763 So. 2d at 677; see also State v. Brown, 2009-2456 (La. 5/11/10), 35 So. 3d 1069, 1073 ("[t]here is no equivalent under Louisiana constitutional law to the federal rule that one may not raise the violation of a third person's constitutional rights." (Quotation omitted).

The Fourth Amendment to the United States Constitution and Article I, § 5, of the Louisiana Constitution protect people against unreasonable searches and seizures. Subject only to a few well-established exceptions, a search or seizure conducted without a warrant issued upon probable cause is constitutionally prohibited. Once a defendant makes an initial showing that a warrantless search or seizure occurred, the burden of proof shifts to the state to affirmatively show it was

---

[5]See Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441 (1963) ("[w]e need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" (Citation omitted).

justified under one of the narrow exceptions to the rule requiring a search warrant. LSA-C.Cr.P. art. 703(D); State v. Lowery, 2004-0802 (La. App. 1st Cir. 12/17/04), 890 So. 2d 711, 717-18, writ denied, 2005-0447 (La. 5/13/05), 902 So. 2d 1018.

The right of law enforcement officers to stop and interrogate one reasonably suspected of criminal conduct is recognized by LSA-C.Cr.P. art. 215.1, as well as both federal and state jurisprudence. Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); Lowery, 890 So. 2d at 718. Louisiana Code of Criminal Procedure article 215.1(A) codifies the United States Supreme Court's authorization of protective searches for weapons in Terry and provides: "[a] law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions." Lowery, 890 So. 2d at 718.

Reasonable suspicion to stop is something less than the probable cause required for an arrest, and the reviewing court must look to the facts and circumstances of each case to determine whether a detaining officer had sufficient facts within his knowledge to justify an infringement of the suspect's rights. Evidence derived from an unreasonable stop, i.e., seizure, will be excluded from trial. In order to assess the reasonableness of an officer's conduct, it is necessary to balance the need to search or to seize against the harm of invasion. Id.

The totality of the circumstances must be considered in determining whether reasonable suspicion exists. The detaining officers must have knowledge of specific, articulable facts, which, if taken together with rational inferences from those facts, reasonably warrant the stop. Public safety requires some flexibility for police officers to investigate and prevent crime. In reviewing the totality of the circumstances, the officer's past experience, training and common sense may be considered in determining if his inferences from the facts at hand were reasonable.

12

Deference should be given to the experience of the officers who were present at the time of the incident. A trial court's ruling on a motion to suppress the evidence is entitled to great weight because the court had the opportunity to observe the witnesses and weigh the credibility of their testimony. Id.

Prior to trial, the defendant moved to suppress all statements and physical evidence in the possession of the State he alleged were obtained in violation of his due process rights.

Tangipahoa Parish Sheriff's Office Detective Lindell Bridges testified at a pretrial hearing on a motion to reveal the confidential informant.[6] On weekends, Detective Bridges provided security at North Oaks Medical Center. On Monday, November 28, 2016, he was sitting by the emergency-room door when he was approached by a man. The man told Detective Bridges that he wanted to talk about a murder in Hammond. The man said "it was a young black male by the name of Money with tattoos on his neck and his hands." The man further stated Money lived in the Klein Road area. Detective Bridges advised Detective Chase Zaffuto, a ten-year veteran of the Hammond Police Department, of the man's statements.

Detective Zaffuto was the lead investigator in the victim's homicide investigation. After receiving information from Detective Bridges, Detective Zaffuto searched social media for the nickname "Money."[7] He learned Felder used "Money" as his Facebook name. Detective Zaffuto also recognized the Klein Road Trailer Park in Felder's profile picture. Klein Road was off Old Baton Rouge Highway and "not far from where the homicide occurred." Additionally, Felder's Facebook profile picture was a picture of himself and the defendant. Detective Zaffuto was familiar with the defendant due to his "[p]revious dealings through the Hammond Police Department."

---

[6]In determining whether the ruling on the defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. State v. Chopin, 372 So. 2d 1222, 1223 n.2 (La. 1979).

[7]The transcript also references this nickname as "Monie."

Additional research on Facebook revealed that shortly after the murder, the defendant was on Facebook communicating with Felder's girlfriend - Sabrina Kemp. The defendant told Kemp he needed to talk to her and it was urgent and important. Kemp told the defendant she had to pick up Felder from work.

The police proceeded to the Klein Road Trailer Park to locate Felder and Kemp. They had information about the particular vehicle Kemp drove. Thereafter, the police saw the vehicle coming out of the trailer park and signaled it to stop. Felder and Kemp were in the vehicle. Kemp consented to assisting police with their inquiries at the police station. Felder was arrested on traffic citations for "no driver's license."

The police obtained a consent to search the vehicle that Kemp had been driving from Kemp's mother, the owner of the vehicle. They also obtained a search warrant for the vehicle. Felder's cell phone was recovered from the vehicle.

After being advised of her Miranda[8] rights, Kemp indicated she initially transported the murder weapon from the Klein Road Trailer Park to her house. When she realized, however, that she still had the murder weapon in the car, she "brought it back" to Felder. The weapon was never recovered.

After being advised of his Miranda rights, Felder was questioned concerning what he knew about the murder of the victim. Felder advised the police that after he finished work, he met with his friend - the defendant. Felder confirmed that the defendant was in Felder's profile picture. Felder also had another profile picture with the defendant in which Felder had a gun in his pocket or waistband. Felder indicated the gun in the picture was the murder weapon. Additionally, Detective Zaffuto was able to confirm that Felder lived in the Klein Road Trailer Park. Felder subsequently used his cell phone to call the defendant from the police station. Thereafter, the defendant agreed to come to the police department for

---

[8]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

14

questioning.

After being advised of his Miranda rights, the defendant provided the police with the names of Rheams and Newman. The defendant indicated Newman was "the shooter" in the victim's homicide.

After obtaining permission to question Rheams from his mother, the police took a statement from him concerning his and the defendant's involvement in the victim's homicide.

Newman was brought in for questioning and, after being advised of his Miranda rights, was questioned about the homicide of the victim. Further, Detective Zaffuto obtained DNA buccal swabs from the defendant, Rheams, and Newman.

At the conclusion of the suppression hearing, defense counsel argued Felder was stopped "without any probable cause." Counsel claimed the stop was actually an arrest, and thus, everything following the illegal stop, particularly information concerning the involvement of the defendant in the homicide of the victim, should be suppressed as fruit of the poisonous tree. The State argued that at the time of the traffic stop, the police reasonably believed Felder was a suspect in the investigation of, or had information concerning, the homicide of the victim. The trial court denied the motion to suppress, citing the entirety of the circumstances.

When a trial court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court's discretion, i.e., unless such ruling is not supported by the evidence. See State v. Green, 94-0887 (La. 5/22/95), 655 So. 2d 272, 280-81. However, a trial court's legal findings are subject to a *de novo* standard of review. See State v. Hunt, 2009-1589 (La. 12/1/09), 25 So. 3d 746, 751.

Whether an anonymous tip establishes reasonable suspicion to conduct an investigatory stop is considered under the totality of the circumstances. The

15

sufficiency of an anonymous tip under Terry is determined by the reliability of its assertion of illegality and not just its tendency to identify a determinate person. State v. Boss, 2004-457 (La. App. 5th Cir. 10/26/04), 887 So. 2d 581, 586. "[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." Alabama v. White, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416, 110 L. Ed. 2d 301 (1990); State v. Lane, 2009-179 (La. App. 5th Cir. 9/29/09), 24 So. 3d 920, 924, writ denied, 2009-2360 (La. 5/21/10), 36 So. 3d 226.

The anonymous caller's ability to predict the suspect's future behavior goes towards reliability, as it demonstrates inside information and a special familiarity with the suspect's affairs. Boss, 887 So. 2d at 586. Predictive ability is not always necessary; a non-predictive tip coupled with police corroboration or independent police observation of suspicious activity can provide the police with the requisite reasonable suspicion to detain a suspect. State v. Triche, 2003-149 (La. App. 5th Cir. 5/28/03), 848 So. 2d 80, 85, writ denied, 2003-1979 (La. 1/16/04), 864 So. 2d 625; Lane, 24 So. 3d at 924.

In the instant matter, we find no error or abuse by the trial court in denying the motion to suppress. The seizure at issue was a reasonable intrusion on Felder's privacy. While Felder was arrested on outstanding citations *after* the stop; the police needed only reasonable suspicion to legally stop the vehicle in which he was riding. The totality of the circumstances provided the police with reasonable suspicion that Felder was involved with criminal conduct. The police had knowledge of specific, articulable facts, which, if taken together with rational inferences from those facts, reasonably warranted the stop of Felder. Detective Bridges was personally advised that "a young black male by the name of Money with tattoos on his neck and his hands" was involved in a murder in Hammond. Detective Bridges was further advised that "Money" lived in the Klein Road area. Detective Zaffuto learned

Felder used "Money" as his Facebook name. Further, Detective Zaffuto recognized the Klein Road Trailer Park in Felder's profile picture. Klein Road was located off Old Baton Rouge Highway and was "not far from where the homicide occurred." Additionally, the defendant was in Felder's Facebook profile picture. Detective Zaffuto was familiar with the defendant due to his "[p]revious dealings through the Hammond Police Department." Social media also indicated that shortly after the murder, the defendant was on Facebook communicating with Felder's girlfriend, Kemp. The defendant told Kemp he needed to talk to her and it was urgent and important. Considering these facts, the trial court did not err in denying the defendant's motion to suppress.

This assignment of error also lacks merit.

## MOTION FOR MISTRIAL

In assignment of error number 3, the defendant contends the trial court erred in denying his motion for mistrial due to the Covid-19 pandemic and the inability to safely conduct a jury trial that comported with state and federal Covid-19 guidelines without distracting the jurors and prejudicing the outcome of the trial.

Louisiana Code of Criminal Procedure article 775 provides for a mistrial when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial. A mistrial is a drastic remedy to be invoked only when the defendant suffers such substantial prejudice that he is deprived of any reasonable expectation of a fair trial. The decision whether to grant or to deny a mistrial lies within the sound discretion of the trial court, and will not be disturbed absent a clear abuse of that discretion. Juror misconduct is not grounds for an automatic mistrial; prejudice must also be established. State v. Eason, 2019-0614 (La. App. 1st Cir. 12/27/19), 293 So. 3d 61, 74.

Following the selection of the jury on the first day of trial, the presiding judge became ill. Prior to the commencement of the second day of trial, the judge advised

17

the Judicial Administrator that based on his condition, he did not feel he would be able to preside over the second day of trial. The judge did not know when, based upon his illness, he would be able to return. The Judicial Administrator contacted Judge Jeffrey S. Johnson and inquired whether he would be available to preside over the trial. Judge Johnson agreed to preside over the trial. Thereafter, the Louisiana Supreme Court appointed Judge Johnson as an *ad hoc* judge in the matter.

At the beginning of the second day of trial, before the jury entered the courtroom, Judge Johnson stated he did not know the diagnosis of the original judge's illness. Judge Johnson had no reason to believe or disbelieve the judge had Covid-19. Judge Johnson stated, "[i]t's my appreciation that the judge's blood pressure was high and that he has an appointment this morning in order to address that issue."

The defense moved for a mistrial. The defense argued that given the fact that the State was in Phase II of the Covid-19 pandemic, the judge's illness would distract the jurors.[9, 10] The defense argued that under Phase II, less than fifty people should be in a room and they should be six feet apart.[11] The defense further claimed that jury selection was noncompliant with the Phase II mandate and a mistrial was appropriate because the prejudice to the defendant outweighed any concerns that the State had in regard to its witnesses, its time, its finances, or its other resources.

In regard to the jury selection process, Judge Johnson initially noted the defense failed to object to the Covid-19 protocol. The court also noted that all jurors

---

[9]Between June 4, 2020 and September 10, 2020, Louisiana was in Phase II under the White House Coronavirus Task Force guidelines on reopening the economy. 74 JBE 2020 & 117 JBE 2020. The defense moved for a mistrial on July 22, 2020.

[10]The defense also moved for a mistrial on the basis that Judge Johnson, who was serving in an *ad hoc* capacity, had to be randomly allotted. Judge Johnson denied the motion for mistrial on that basis. The defendant does not assign error to the denial of the motion for mistrial on the basis of failure to randomly allot Judge Johnson to the case. Thus, the issue of whether or not Judge Johnson was required to be randomly allotted to preside over the case is not before this court. See LSA-C.Cr.P. art. 920.

[11]Under Phase II, all individuals were advised to avoid groups of any size that did not allow for social distancing. Additionally, with the exception of critical infrastructure, crowd sizes were limited to no more than 50% of total occupancy as determined by the State Fire Marshal. 74 JBE 2020.

and the prior judge wore masks during jury selection. The court further noted the trial judge sits at "his chambers" in the courtroom, which are removed from the jury and the witnesses. The court denied the motion for mistrial asserted on the basis of noncompliance with Phase II during jury selection.

Thereafter, Judge Johnson advised the jury:

[The original judge] is not here today because he's ill. I do not know what his illness is. I know that he is not here today and that he has a doctor's appointment, I believe, probably as we speak. But that I'm going to be here to handle these matters.

Judge Johnson then individually questioned each juror and each alternate juror in the absence of the other jurors. The questioning concerned whether, given their awareness of Covid-19, and without any assumption that the earlier presiding judge had that illness, would the judge's absence distract the juror such that he or she would be unable to hear the case and make a decision based on the testimony of the witnesses. Each juror and each alternate juror indicated either that the judge's absence would not distract them to the extent they could not perform their duties as a juror (or alternate juror) or that, given their knowledge of his absence, they could still perform their duties as a juror (or alternate juror).

Additionally, Judge Johnson asked juror 1 if she still thought she could be fair and impartial and make a decision in the case. She answered affirmatively. Judge Johnson asked juror 2 if the original judge's absence would interfere with her ability to hear and decide the case, and she responded that the judge made no difference. Judge Johnson asked juror 3 if she could hear the case and make a decision despite the fact that the original judge was not present. She answered affirmatively. Judge Johnson asked juror 4 if he would be fair and do his job just as his oath was taken during jury selection. He answered affirmatively. Judge Johnson asked juror 5 if the absence of the judge would distract her from being fair to the defendant. She answered negatively. Judge Johnson asked juror 6 if she could still move forward

19

and do her job. She answered affirmatively. Judge Johnson asked juror 7 if the judge's absence would weigh on him in such a way that he could not be fair to the defendant or the State. He answered negatively. Judge Johnson asked juror 7 if he felt that he could go forward and do his job. He answered affirmatively. Judge Johnson asked juror 8 if the "possibility of circumstance" would affect her in any way. She answered negatively. Judge Johnson asked juror 10 if she felt that she could still hear the evidence and make a decision based on the evidence. She answered affirmatively. Judge Johnson asked juror 10 if she felt that she could be fair to the defendant. She answered affirmatively. Judge Johnson asked juror 11 if the information concerning the judge's absence would distract him so that he could not be fair to the defendant or to the State. He answered negatively. Judge Johnson further asked juror 11 if he felt he could fulfill his oath and be fair and make a decision based on the evidence in light of the circumstances. He answered affirmatively. Judge Johnson asked juror 12 if he believed he could be fair to the defendant and to the State. He answered affirmatively. Judge Johnson asked alternate juror 1 if she thought she could be fair to both the defendant and the State if she were placed into the jury to make a decision. She answered affirmatively. Judge Johnson asked alternate juror 2 if he felt he could be fair to both the defendant and the State with respect to hearing the case in light of all of the circumstances, including the most recent development. He answered affirmatively.

Following the questioning of the jurors and alternate jurors, the defense argued it still believed there were grounds for a mistrial. The defense claimed it thought Judge Brian Abels's absence would negatively impact the jurors' ability to render a fair decision and would distract the jurors. The trial court disagreed with defense counsel, noting the court "did not hear even an inkling of that possibility being an issue." The trial court denied the motion for mistrial based on the absence of Judge Abels.

On appeal, the defendant argues the answers given to Judge Johnson by the jurors were insufficient to demonstrate their ability to be fair and impartial. The defendant claims the answers "were given under the immediate stress of processing the nature of Judge Abels['s] mysterious illness in addition to questioning if they themselves had been exposed to the Covid-19 virus the day prior."

There was no clear abuse of discretion in the denial of the motion for mistrial based on the absence of Judge Abels. Judge Johnson made a credibility determination in accepting the responses of the jurors and alternate jurors. See State v. Dorsey, 2010-0216 (La. 9/7/11), 74 So. 3d 603, 627, cert. denied, 566 U.S. 930, 132 S. Ct. 1859, 182 L. Ed. 2d 658 (2012) ("[d]eference is given to the trial court's determination because the trial judge has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questions by the parties' attorneys, which are not readily apparent at the appellate level where review is based on a cold record."); see also State v. Rieckmann, 2014-1441 (La. App. 1st Cir. 9/18/15), 2015 WL 5515017, *4 ("[t]he credibility of witnesses will not be reweighed on appeal."); State v. Nolan, 503 So. 2d 1186, 1190 (La. App. 3rd Cir.), writ denied, 507 So. 2d 226 (La. 1987) ("[i]t is conceded in the majority of criminal proceedings that only one judge will preside over the trial. However, the fact that more than one judge does preside is not deemed a mandatory ground for mistrial anywhere in the Code of Criminal Procedure. There is nothing which would necessarily prejudice a defendant in having two judges preside over his trial, especially in the instant case where the first judge stepped down after just the first day of voir dire.").

This assignment of error is without merit.

## REVIEW FOR ERROR

This court routinely reviews criminal appeals for patent error. LSA-C.Cr.P. art. 920. Our review has revealed the existence of a patent sentencing error in this

case. The defendant filed motions for new trial and in arrest of judgment which were denied by the trial court. The trial court erred by immediately sentencing the defendant without waiting twenty-four hours after the denial of the post-trial motions, as required by LSA-C.Cr.P. art. 873. The record reflects no waiver of this time period by the defendant. Nevertheless, in State v. Augustine, 555 So. 2d 1331, 1333-34 (La. 1990), the Louisiana Supreme Court indicated that a failure to observe the twenty-four hour delay provided in Article 873 will be considered harmless error where the defendant could not show that he suffered prejudice from the violation. See State v. White, 404 So. 2d 1202, 1204-05 (La. 1981). The court in Augustine concluded that prejudice would not be found if the defendant had not challenged the sentence imposed and the violation of the twenty-four hour delay was merely noted on patent error review. Augustine, 555 So. 2d at 1334. In the instant case, the defendant has not assigned error to the trial court's failure to observe the twenty-four hour delay, nor has he contested the sentence imposed. Under these circumstances, this patent sentencing error is harmless. See State v. Bilbo, 97-2189 (La. App. 1st Cir. 9/25/98), 719 So. 2d 1134, 1140-41, writ denied, 98-2722 (La. 2/5/99), 737 So. 2d 747.

**CONVICTION AND SENTENCE AFFIRMED.**